# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

CHARLES E. SEATON, JR.,

    Plaintiff,

v.

VALERO ARDMORE REFINING,

    Defendant.

Case No. CIV-08-180-RAW

## ORDER & OPINION

Before the court is Defendant's motion for summary judgment [Docket No. 28] and amended motion in limine [Docket No. 37]. Plaintiff, Charles Seaton (hereinafter "Seaton" or "Plaintiff") brought this action against Defendant, Valero Ardmore Refining[1] (hereinafter "Valero" or "Defendant"), claiming damages under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. (hereinafter "ADA"). Seaton claims that Valero did not promote him to a full-time maintenance planner position in June 2007 because of Valero's mistaken belief that Seaton's pacemaker caused him to be disabled. Valero argues that Seaton cannot demonstrate Valero regarded him as disabled and that Valero had legitimate, non-discriminatory reasons for not promoting Plaintiff to the full-time maintenance planner position.

## BACKGROUND

The court views the evidence and draws reasonable inferences therefrom in the light most favorable to Plaintiff. For purposes of the summary judgment motion, all doubts will be resolved in Plaintiff's favor.

---

[1]Defendant states that its correct name is "Valero Refining Company - Oklahoma."

Plaintiff began his employment with Valero in August of 2002. His first position was as a "yard hand." In February of 2003, Seaton had a pacemaker surgically installed to monitor his heartbeat. When he had this medical procedure, he was off work for several weeks.

In July 2004, Seaton was promoted into Valero's operations department as a "B Operator" in the "Alky Unit." The Alky Unit uses acid to refine high octane gasoline. Seaton is still employed as a B Operator. Since his promotion to B Operator, Seaton has reported to Scott Crawford, an Operations Superintendent.

Valero acknowledges that Seaton's job performance has been satisfactory throughout the term of his employment. Seaton has not received any disciplinary actions or negative references and has received favorable performance reviews. Seaton received recommendations from internal managers and external Refinery vendors for the full-time maintenance planner position.

In addition to his B Operator duties, Seaton has occasionally served in various temporary or "step up" positions, including "A Operator," "maintenance planner," and "turnarounds/shutdowns planning and scheduling."[2] A maintenance planner is required to provide job plans for daily maintenance activities, plan and schedule small unit shutdowns, prepare job packages for expense projects, and provide planning assistance for emergency shutdowns. The maintenance planner is also responsible for effectively communicating with Valero personnel and outside contractors to prioritize and coordinate maintenance work.

---

[2]Valero is a unionized company. The terms and conditions of Seaton's employment are governed by a collective bargaining agreement. Pursuant to that agreement, Valero employees can temporarily "step up" to a position for a maximum of 120 days. Following the 120-day period, the employee returns to his or her regular position unless the union authorizes the employee to continue in the "step up" position. It is common for Valero employees to "step up" at various times during their employment.

Valero internally posted an opening for a full-time maintenance planner position in June of 2007. Plaintiff and approximately 40 other internal and external applicants expressed interest in the position. From the initial pool of applicants, six were ultimately chosen to be formally interviewed for the position. The six chosen to be interviewed were Seaton, Ronnie Glenn, Jason Chaney, Eddie Lankford, Steve Ott and Joshua Abbott.

Valero interviewed the six applicants in two rounds. Initially, Brad Dierlam, Human Resources Specialist, interviewed each of the applicants. After the first round of interviews, Ott withdrew his application. The remaining five applicants were then each interviewed by a four-person management panel. The panel included Dierlam; Larry McElhiney, Maintenance Director; Steve Howard, Maintenance Scheduler; and Crawford.

Because Crawford is Seaton's supervisor, Tom Barnthouse, another Operations Superintendent, replaced Crawford on the panel for Seaton's interview. On July 25, 2007, Seaton, Lankford and Chaney were each interviewed by the panel. Glenn was interviewed by the panel on July 26, 2007; Abbott on August 7, 2007.

According to Valero, during their respective interviews, the applicants were each asked the same ten questions. According to Seaton, during his interview he was told that the maintenance planner position is a very stressful job and asked whether his health could hold up to doing the job. He claims he was also told that Valero did not want to put him into a stressful position and asked about his health, his heart and whether he could handle the stress. He states that he was also told that Valero did not want to put him in a position that would kill him.

In response, Seaton states that he told his interviewers that he has worked in the A Operator and B Operator positions, that those positions are more strenuous and stressful than the

3

maintenance planning position, and that his health has never been an issue.  He also stated that he was currently performing the maintenance planning (as a temporary "step up" job), and that he was performing it without any problems.  He also mentioned the comparison of sitting behind a desk, a regular activity involved in the maintenance planner position, as opposed to climbing 250 feet towers four times per day, a regular activity involved in both the A and B Operator positions.

Plaintiff also points out that prior to the interviews and selection process for the maintenance planner position, various managers, including Allen Dubea, the plant manager, and McElviney were aware Seaton had a pacemaker.  Valero acknowledges that in August of 2007, some employees were aware that Seaton had a pacemaker.  Plaintiff notes that on numerous occasions since his procedure in February of 2003, managers and co-workers would ask him about his health and how he was feeling.  He states that heart health was the obvious subject of the questions.

After the interviews, Plaintiff was not offered the full-time maintenance planner position.  Instead, Lankford was offered the position.  Valero determined that Lankford was the most qualified applicant for the maintenance planner position.  Valero states that Seaton ranked third out of the five finalists.

On August 20, 2007, McElhiney and Valero's Human Resources Director, Chad Wilfong, met with Seaton and notified him of the decision to offer the maintenance planning position to Langford.  During the meeting, McElhiney told Seaton that one of the reasons he was not selected for the position was his relatively poor communication skills in comparison to Lankford.  Seaton was upset and claimed he was being treated unfairly because people liked Langford better

than him. Seaton did not claim during this meeting that he was being discriminated against based on any perceived disability.

Seaton also argues that he was told that Langford was selected because he had more involvement in the community. He further claims that McElviney warned him not to complain about being denied the position because it could affect his opportunities down the line.

Seaton states that in the "promotability" category of Valero's interview evaluation, Seaton was given a "poor" ranking and Langford was given an "excellent" ranking. In the experience category, Seaton received an "average" ranking, and Langford received a "good" ranking. The evaluation included fourteen categories. The candidates were graded in each category on a scale of 0 to 4: 4 being excellent, 3 being good, 2 being average, 1 being poor, and 0 meaning the applicant lacked the requisite experience or skill.

Although Langford was hired for the full-time maintenance planning position, Seaton performed maintenance planning duties throughout the remainder of 2007 and over the course of 2008. Valero has continued to provide Seaton opportunities in planning roles through "step up" assignments for planning and scheduling turnarounds. From January 2008 through August 2008, Seaton held a "step up" assignment with turnaround planning and scheduling duties.

In November of 2007, Seaton filed a discrimination charge with the Equal Employment Opportunity Commission (hereinafter "EEOC"). He claimed that he was better qualified and had more experience than the person who was promoted to the maintenance planner position. Seaton claims Valero regarded him as being disabled because he has a pacemaker.

Seaton states that on numerous occasions between February 2003 and June 2007, he was given different work duty assignments and that before each assignment change, Valero's

representatives would routinely ask him about the condition of his heart and how his heart condition might affect his ability to perform the duties. The pacemaker never affected Seaton's ability to perform any of his assigned duties.

Seaton states that he has appointments with his heart doctor twice per year and that each time he sees the heart doctor, Valero's Human Resources Department insists upon receiving a written release before allowing him to return to work. He argues that other employees who see a doctor on a regular basis are not required to present written releases before returning to work. He does not, however, specify whether these other regular doctor visits relate to heart health, some other serious health issue, or are merely routine checkups.

Plaintiff also notes that Valero employees are "subjected to" a physical exam each year. He claims that during the years 2003, 2004, 2005 and 2006, he was subjected to a more strenuous physical examination than similarly situated co-workers. Before the 2007 exam, Seaton asked why he was being subjected to a more strenuous physical. Plaintiff notes that in 2007, "for the first time since the commencement of his employment," he was subjected to the less strenuous physical.

According to Seaton, he logged 750 hours as a "step up" maintenance planner in 2003; 240 hours in 2004; 750 hours in 2005; and 1,539 hours in 2006 and 2007. During June, July and August of 2007, Seaton covered the maintenance planner position until a permanent replacement could be determined through the interview and evaluation process. The tasks required of the temporary maintenance planner position were the same as those required for the permanent full-time maintenance planner position.

Seaton is familiar with the other five final applicants for the maintenance planner position. Although in his EEOC complaint, Seaton claimed that he was better qualified and had more experience than the person who was promoted to the maintenance planner position, in his response to the motion for summary judgment, he states that he believes he possessed comparatively equal experience working in a "step up" capacity within the Maintenance Unit as a maintenance planner as did Langford. According to Valero, Langford had 3,708 "step up" hours as a maintenance planner in 2006-2007.[3] Seaton argues, however, that a significant number of those hours may have been performed in a different unit, not in the Maintenance Unit. Seaton explains that some of his hours as a maintenance planner position were also spent in other units. He does not explain, however, how the maintenance planner experience in other units would not qualify or help an employee do the maintenance planner position in the Maintenance Unit.

## ANALYSIS

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying the summary judgment standard, the court views the evidence and draws reasonable inferences therefrom in the light most favorable to Plaintiff. Burke v. Utah Transit Auth. & Local 382, 462 F.3d 1253, 1258 (10th Cir. 2006). All doubts will be resolved in Plaintiff's favor. At this stage, however, Plaintiff may not rely on mere allegations, but must have set forth, by affidavit or other evidence, specific facts in support of his Complaint. Id.

---

[3]Valero does not mention the number of "step up" hours as a maintenance planner either Seaton or Langford had in 2003 or 2004. Valero does note that Langford had 1,407 in 2005.

**ADA Claim**

"A prima facie case of ADA discrimination consists of three elements: the plaintiff (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability." <u>Zwygart v. Board of County Comm'rs of Jefferson County, Kan.</u>, 483 F.3d 1086, 1090 (10th Cir. 2007).

With regard to the first element, the ADA defines a "disability . . . with respect to an individual" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." <u>MacDonald v. Delta Air Lines, Inc.</u>, 94 F.3d 1437, 1443 (10th Cir. 1996). Seaton acknowledges that he is neither disabled, nor has any record of disability. Instead, he relies on subsection (C) and claims that he was "regarded as having" an impairment. Plaintiff claims that he has no impairment, but was treated by Valero as having a substantially limiting impairment. <u>See</u> <u>id</u>. at 1444.

A person is "regarded as having" an impairment that substantially limits his major life activities when other people treat him as though he has a substantially limiting impairment. <u>Id</u>. The ADA defines "major life activities" as: "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." <u>Id</u>. Seaton claims that Valero regarded him as having an impairment that substantially limits his ability to work.

In order to show "that an impairment 'substantially limits' the major life activity of working, an individual must show 'significant restriction in the ability to perform either a class of

jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" Id. (quoting Bolton v. Scrivner, Inc., 36 F.3d 939, 942 (10th Cir. 1994). Moreover, if a plaintiff "shows only that he is unable 'to perform a single, particular job,' the regulations and case law make clear that he has not shown that he is 'substantially limited in the major life activity of working.'" Id. at 1445. "Thus, to establish that he has a disability under 42 U.S.C. § 12102(2)(C), [Seaton] must have shown that [Valero] regarded him as being substantially limited in performing either a class of jobs or a broad range of jobs in various classes."

Plaintiff lists the contentions he makes to support his claim that Valero regarded him as being substantially limited in the major life activity of working: (1) the multi-year history of intensive questioning about his heart health; (2) the "poor" promotability ranking; (3) subjecting him to a much more strenuous physical than similarly situated co-workers; (4) specific statements made and questions posed during the panel interview; and (5) requiring a work release each time the heart doctor was consulted for maintenance on the pacemaker.

Taking Plaintiff's contentions as true, the court does not believe that he has demonstrated that Valero regarded him as being substantially limited in the major life activity of working. The court will address each of Plaintiff's contentions, but first points out that Plaintiff himself has noted the strenuous physical requirements of his current job as a B Operator in the Alky unit. Seaton made note of the fact that his B Operator position requires him to climb 250 feet towers four times per day, whereas the maintenance planner position involves more time behind a desk. Seaton has pointed out that the maintenance planner position is much less strenuous and stressful than his current position. The court also notes the obvious fact that Seaton is still employed as a

9

B Operator and still periodically holds "step up" positions as an A Operator and as a maintenance planner.

As to Plaintiff's first contention, as Plaintiff described the questions about his health, they sound like simple, compassionate inquiries into a co-worker's or a friend's health. When a co-worker or friend has a serious surgery such as having a pacemaker installed, any conscientious co-worker or friend would thereafter, and likely for some time thereafter, inquire as to his health and how he feels. The motivation for any such questions would most obviously be compassion. Additionally, Seaton does not provide any evidence or even argue that these co-workers treated him differently other than asking him how he was doing. Even if, however, as Plaintiff seems to insinuate, his co-workers were making these inquiries out of some malice or ill will, the questions alone would not amount to proof that his employer regarded him as being substantially limited in the major life activity of working. And even if, as Plaintiff argues, managers asked him about his health, that alone would not show that Valero regarded him as being substantially limited in the major life activity of working.

As to Seaton's second contention, the fact that he received a ranking of "poor" on one of the fourteen categories in which the applicants were ranked certainly does not demonstrate that Valero regarded him as being substantially limited in the major life activity of working. As to Seaton's third contention, Plaintiff states that in 2007, he was given the less strenuous physical "for the first time since the commencement of his employment." So he was given a more strenuous physical since the commencement of his employment even before he had the pacemaker installed. Surely, if Valero regarded him as being disabled, it would not have subjected him to a more strenuous physical. The more strenuous physical does not show that

Valero regarded him as being substantially impaired in working.

As to Seaton's fourth contention, even if the interviewers inquired into Seaton's health and asked him whether he could perform the required tasks, this does not show that Valero ultimately decided that Seaton was substantially limited in working. Seaton does, after all, have a pacemaker. This does not make him impaired or disabled, but it would be natural to ask him about his health and ability to handle stress. Furthermore, however, as Seaton has pointed out, his current job is more stressful than the one for which he was applying.

As to Seaton's fifth contention, as he has pointed out, the B Operator position is a very physically strenuous job. This is his current position. Valero would quite likely be negligent if it did not require a work release after Seaton's scheduled visits to the heart doctor. Seaton notes that Valero does not require work releases from other employees who have regular doctor visits, but he provides no evidence to that effect and does not specify as to whether these other regular doctor visits are simply routine check-ups or relate to serious health issues. The fact that Valero requires a work release after Seaton makes his scheduled visits to his heart doctor does not show that Valero regarded Seaton as being substantially limited in working.

Moreover, all of Plaintiff's contentions taken together do not show that Valero regarded him as being substantially limited in the major life activity of working.[4] The fact is, Valero has

---

[4]The court notes that while Seaton does not list these in his "five contentions," he also argued that: (1) Valero representatives told him one of the reasons for hiring Langford was that he was more involved in the community than Seaton, and (2) after Langford was hired, McElviney told Seaton not to complain about it because that could harm his changes for promotion in the future. The court does not believe these contentions add anything to his claims that Valero regarded him as being substantially limited in the major life activity of working. Even if Valero did hire Langford because he was more involved in the community or Valero thought that he was, this is not a discriminatory action. Also, even if McElviney suggested that Seaton should not complain because that could hurt his chances in the future, such a suggestion does not indicate that Valero discriminated against

continued to employ Seaton in a more physically strenuous position and has also continued to give him opportunities to work as a maintenance planner in a "step up" capacity. If Valero regarded Seaton as being substantially limited in the major life activity of working, it would not continue to employ him in these capacities, Valero managers most likely would not have recommended him for the position, he would not likely have been one of the chosen six candidates to interview for the position, and he likely would not have been ranked third out of the candidates. The court, therefore, finds that Plaintiff has failed to establish the first prong of his ADA claim. The court need not reach the second and third elements.

Even if Plaintiff had made a *prima facie* case of ADA discrimination, Valero offered a legitimate, non-discriminatory reason for hiring Langford – after two rounds of interviews, Valero determined Langford was more qualified for the position. Seaton was ranked third out of the top five candidates. Valero managers also told Seaton that one of its reasons for hiring Langford was that he possessed better communication skills than Seaton.

The burden, therefore, shifts back to Seaton "to show that there is a genuine dispute of material fact as to whether [Valero's] reason for the challenged action is pretextual and unworthy of belief." Trujillo v. University of Colorado Heath Sciences Center, 157 F.3d 1211, 1215 (10th Cir. 1998). Valero's reason is not a "'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.'" Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

Seaton has not shown that Valero's reason was false. As a matter of fact, Seaton has

---

Seaton by not hiring him over Langford. In fact, at the time McElviney allegedly told Seaton not to complain, Seaton was complaining that Valero's managers liked Langford better than him, not that he had been discriminated against.

stated that he believed he possessed comparatively equal experience working in a "step up" capacity within the Maintenance Unit as a maintenance planner as did Langford. He argues that some of Langford's "step up" hours as a maintenance planner may not have been within the Maintenance Unit, but does not show how that would affect his experience. Seaton also admits that Langford's experience level was not personally known to Seaton other than the fact that they both started work at Valero in 2002. Valero is entitled to summary judgment because Seaton did "not offer evidence tending to show the defendant's innocent explanation for [its] employment decision was false." Id. (quoting Randle v. City of Aurora, 69 F.3d 441, 451 n. 14 (10th Cir. 1995).

Furthermore, Seaton has not proven that the real reason Valero did not offer him the full-time maintenance position was discrimination. He argues that the same five contentions above show pretext, but the court does not agree. For the same reasons the court noted with regard to those contentions not showing that Valero regarded Seaton as being substantially impaired in working, those contentions also do not show pretext. Seaton also states that Valero told him a reason for hiring Langford was that he was more involved in the community. Again, this does not establish pretext. Finally, Seaton argues that McElviney told him he should not complain about not getting the position because that could hurt him in the future. This was probably not an advisable statement, but again, it does not show pretext. Furthermore, all of Plaintiff's allegations taken together do not show pretext.

## CONCLUSION

Accordingly, Defendant's motion [Docket No. 28] is hereby GRANTED. This action is DISMISSED. Additionally, Defendant's Amended Motion in Limine [Docket No. 37] is DENIED as MOOT.

IT IS SO ORDERED this 6th day of May, 2009.

**Dated this 6th Day of May 2009.**

Ronald A. White
United States District Judge
Eastern District of Oklahoma

j4h4i0